## AUTOMOBILES IN COLLISION AT A STREET INTERSECTION.

Common Pleas Court of Cuyahoga County,

FRED JOSEPH v. F. J. LARKWORTHY.

Decided, December 3. 1913.

*Preferential Rights at Street Crossings—Provisions of the Cleveland Ordinance Relating to Vehicles at Street Crossings Construed—Common Law Rule Still in Force, When—Recklessness and Disregard of the Rights of Others on the Part of Automobile Drivers a Serious Menace.*

1. It is negligence *per se* to drive in a much frequented or built up portion of a city a vehicle that is so covered or constructed or loaded as to prevent the driver having an adequate view of the traffic in the street on both sides of and following his vehicle.
2. Where a city ordinance gives to drivers on streets running east and west the right-of-way at street intersections over those on streets running north and south, or *vice versa*, the right so given is not exclusive but preferential only, and entitles the driver so preferred to cross first only in the event of his having first arrived at the crossing.
3. A driver of an automobile so preferred must in all cases give warning of his approach to a street crossing, and must have his car under reasonable and proper control; and the driver of a car on the intersecting street has the right to assume, upon arriving first at the crossing, that the machine which he sees approaching will be so handled that he may cross ahead of it without danger of a collision.
4. In the event of doubt as to which car arrived first, the common law doctrine applies, and each driver must use and exercise ordinary and due care to avoid injury to the other.
5. Where two machines, running on intersecting streets, attempt to make the crossing at an unlawful rate of speed and without regard to the rights of others, a claim for damages can not be maintained by either owner for injury to his machine in the resulting collision.

*Elmer W. Waite,* for plaintiff.
*H. H. Anderson,* contra.

FORAN, J.

This case came into this court on error from the municipal court. The parties will be here referred to in the same relation in which they stood in the court below.

The plaintiff, Fred Joseph, was the owner of a large touring locomobile seventeen feet long and weighing approximately two and one-quarter tons. The defendant, Fred J. Larkworthy, was the owner of an automobile of considerable less weight and size. During the afternoon of January 26, 1913, the plaintiff's car, in charge of one Sherbondy, his servant, was being driven westerly on Quincy avenue, an avenue running in a generally east and west direction, and a public thoroughfare in the city of Cleveland. Quincy avenue crosses and intersects East 79th street, also a public thoroughfare running in a generally north and south direction in said city. As the plaintiff's car approached East 79th street the defendant, driving his car in a northerly direction, approached Quincy avenue. Both cars reached the intersection of these highways at approximately the same time; both attempted to cross at practically the same moment, and as they apparently were going at right angles, the inevitable happened. The plaintiff's car was overturned and was badly injured. The defendant's car was also damaged, but not so seriously but that it was able to limp off and away from the scene of the collision on its own power.

The plaintiff began an action in the municipal court, alleging in the statement of claim that the collision was caused solely by the negligence of defendant. In a statement of defense the defendant denied that he was negligent, and averred that the collision was wholly due to the negligence of the driver of the plaintiff's car, and by way of counter-claim he asked damages from the plaintiff for the injuries sustained by his car. This was to be expected, for in a collision between two motor vehicles the man who is willing to admit that his own negligence was the sole cause of the collision has not yet been discovered.

Over two hundred pages of testimony were taken, all of which has been read and considered by the court.

The collision was witnessed by a number of persons on the street and in adjacent windows; but as the presence of an auto-

mobile on the streets is no longer a novel or an unusual thing, persons are not paying much attention to them, and the testimony of onlookers as to what occurred just before a collision is of little or no value.

Among other things, the plaintiff claims that, even admitting that both cars reached the intersection of the streets at approximately the same time, his servant had the right-of-way; and to support this contention he introduced certain paragraphs of an ordinance approved by the mayor November 13, 1912, being Section 1341 of the Revised Ordinances of the city of Cleveland. These paragraphs read as follows:

"12. Vehicles going on main thoroughfares shall have the right-of-way over others going on intersecting streets.

"13. Vehicles going on main thoroughfares running in a general east and west direction shall have the right-of-way over those going on intersecting main thoroughfares.

"14. No vehicle shall cross any main thoroughfare or make any turn thereon at a greater speed than one-half the legal speed limit upon such thoroughfares."

These paragraphs provide new novel features in traffic regulations. They are not found in Babbitt's Summary of Rules, which embody all the generally prescribed rules for traffic regulation adopted by municipalities at the time his work, "The Law Applied to Motor Vehicles," was issued late in 1910. As changing or modifying the law of the road, so far as we know, the rules in question have never been construed. From the construction placed upon them by the plaintiff's servant in this case, as well as from common observation in their observance and operation in this city, we are of the opinion they are of doubtful wisdom and expediency. If, when the drivers of two motor vehicles reach the intersection of two streets at practically the same time, the driver having the right-of-way insists upon crossing first, under all circumstances and irrespective of existing conditions and of the right of others to pass over the street intersection, a rule giving the right-of-way is a menace rather than a blessing. The tendency seems to be that the party having the right-of-way believes, or affects to believe, that the other party, even if he reaches the crossing first, has no rights which

the right-of-way- man is bound to respect, and he, as a general rule, either wholly ignores them or superciliously grins at him as he dashes across the intersection.   Reprehensible conduct of this kind should be checked, and every man made to understand that he must respect the rights of his fellow men.   The old Latin maxim, *"Sic Utere,"* etc., which says to each and all, enjoy your own rights as you please, but take care not to molest others in the lawful exercise of their rights, seems to have fallen into *"innocuous desuetude."*   If the driver of an automobile would bear constantly in mind that he ought to be a gentleman, and that his rights end where the rights of his neighbor begin, there would be comparatively few automobile accidents and injuries on the public streets.   As Benjamin Franklin once said, we lose more from lack of care than we do from lack of knowledge.

The law applied to motor vehicles has been often defined in the recent adjudications of courts, and is nothing more than the application of common law principles to a more highly specialized and vastly more dangerous instrumentality than slow-moving vehicles.   An automobile, especially the touring car variety, is much more dangerous on a street than an electric street car, and should be operated with a greater degree of care (*Kreutzer v. Weil*, 134 Ky., 563).   The space within which a street car is operated is limited to the rails on which it travels.   The operation of an automobile is often limited only by the brick or stone walls of the buildings abutting on the street.   You know the line of direction in which a street car moves, and can govern yourself accordingly; but no man living knows the line of direction of an automobile under control of an incompetent and reckless driver.

In *Railroad Company* v. *Keary*, 3 O. S., Judge Ranney, in his opinion at page 209, said:

"No one has the right to put in operation forces calculated to endanger life and property without placing them under the control of a competent and ever-active superintending intelligence."

This *dictum* applies with peculiar force to an automobile going at high rate of speed.   Surely such a vehicle going fifteen

miles an hour through a much traveled street in the built up portions of a city is manifestly a dangerous force; and it may be said to be such dangerous force, even if the thoroughfare through which it is running does not run through a congested portion of the city. An automobile going at a reasonable rate of speed, under proper control and under normal conditions, is easily managed; but when driven by reckless or incompetent persons, at a high rate of speed, under abnormal conditions, such as a wet, greasy, uneven roadway, it may *volte face* as quickly as a trained soldier, describe concentric circles, or the snaky, uncanny movements of an incandescent wire, or a rod which the roller or catcher in a rolling mill misses as it comes through the rolls.

It was said in *Steffen* v. *McNaughton,* 142 Wis., 49, and in *Fielder* v. *Davidson,* 77 S. E., 618, that an automobile was not so dangerous as to be put in the same class with locomotives, ferocious animals or dynamite; but we are inclined to believe that the judges who wrote these opinions never saw it under these conditions or in one of these moods. However, the apparent necessity for differentiating it from this dangerous classification would seem to indicate that the power for mischief which it may develop in certain contingencies is generally appreciated.

The right which the statute gives (Section 12604, General Code), to run fifteen miles an hour in municipalities or on streets other than in congested districts, is too frequently interpreted to mean that this rate of speed may be maintained under all circumstances. This is not the law. The statute is construed to mean that fifteen miles an hour is the highest limit of speed that may be maintained in such districts under ordinary circumstances or conditions or in any event. This section of the statute must be construed with Section 12603, General Code, which forbids the operation of "a motor vehicle on the public roads or highways at a speed greater than is reasonable or proper, having regard to the width, traffic, use and the general or usual rules of such road or highway, or so as to endanger the property, life or limb of any person." And this statute is simply a statement or affirmance of the common law doctrine. In a munici-

pality in districts where a speed of fifteen miles an hour is permitted, it would be negligent to run five miles an hour if such speed, in a particular instance, would endanger the property or life or limb of any person. Indeed, if the driver of an automobile sees children two or three years of age toddling across the highway in front of him, the law requires him to come to a dead stop if necessary to avoid injuring them. The automobile in the hands or under the control of a competent, careful man of gentlemanly instincts is one of the greatest boons the genius of man has bestowed upon the race, but in the hands or under the control of the reckless or the incompetent, or the man of hoggish propensities, or a man afflicted with speed mania, whose greatest pleasure in his race with death is to clip a second from the time record, is a positive menace, worse than any plague that ever afflicted the denizens of a city. A man who is afflicted with an insane, feverish, hysterical desire to outrun "the horses of the Sun," and who leads one to believe that he is under the impression that he has but a few moments to live and is anxious to reach home so that he will not be found like Nicanor, "dead in his harness," is entitled to scant consideration. Automobile accidents are generally due to cheap, incompetent drivers, heedless boys, the reckless speeder, the supremely selfish man, the show-off gallant who splits the air, cuts corners and skates on the thin edge of eternity. When such men meet the fate of Darius Green or Icarus, they ought not to be heard to complain, but should be left in the Icarian Sea of disaster into which they fall solely by reason of their own conduct.

The cardinal rule of operation under all circumstances may be gathered from an inspection of Section 12603, General Code, above quoted. It is more clearly stated in the Massachusetts statute, which provides that "every person operating a motor vehicle shall run at a rate of speed at no time greater than is reasonable and proper, having regard to traffic and the use of the way and the safety of the public." The strict observance of this rule, and nothing short of it, will prevent collisions at street intersections in cities, and prevent accidents on streets generally. Ringing a bell or blowing a cacophonous horn is not sufficient

when approaching street intersections in a city where the automobile is going fifteen miles or more an hour, if the circumstances demand a lower rate of speed. *Thies* v. *Thomas,* 77 N. Y. Supp., 276.

The law seems to be well settled that in the absence of a statute or ordinance regulating the manner in which persons should drive when they meet at the intersection of two streets, the rule of the common law applies, and each person must use ordinary or reasonable care to avoid injury to the other; and this reasonable care must be adapted to the place, the circumstances and surrounding conditions. *Schoening* v. *Young,* 104 Pacific, 132; *Jackson* v. *Shaw,* 204 Mass., 165.

"The law of the road does not regulate the manner in which persons shall drive when they meet at the junction of two streets." *Norris* v. *Saxton,* 158 Mass., 46, at 48.

In *Jackson* v. *Shaw, supra,* it was held, that at crossings each person must use due care and is bound to see that he does not interfere with others in the proper exercise of their rights in passing. This is a late case, 1910, and seems to indicate that a person coming to the intersection of two streets, say, going east and west, seeing a person approaching from the north or south, but so far distant that he may safely cross, has a right to do so; and he has a right to presume that the person going north or south is observing the law as to speed and is not traveling in excess of the speed limit, unless he can determine from visual observation that such person is exceeding the speed limit. The person going north or south seeing and knowing that the person going east of west is nearer the intersection than he is, must not interfere with him in the exercise of his right of passage across the street east or west, as he has the right-of-way.

Is the ordinance of the city of Cleveland respecting the right-of-way at street intersections anything more than declarative of this principle? We think not, except that if both reach the intersection at practically the same moment, the person having the right-of-way may pass or cross first. In the absence of the ordinance, the right of each to cross is equal; but because of

the ordinance the person who has not the right-of-way waives his right in the interest of the general welfare; but this ordinance does not give the person having the right-of-way the right to attempt to cross ahead of a person who reaches the junction of the streets a sufficient length of time before him to enable that person to safely cross, both traveling not in excess of the speed limit. Under such circumstances, the person having the right-of-way must not increase his speed and attempt to cross ahead of the other; and if he does and a collision results, he will not be heard to say that his conduct is excusable on the ground of "right-of-way."

To hold that a person traveling east or west, because he has the right-of-way, may catapult across the street intersection regardless of consequences and in utter disregard of the right of the north and south driver, would be absurd and idiotic. If a person driving north or south must, when he reaches the intersection, under all circumstances, stop because a driver going east or west is within thirty or forty feet of that crossing, it would be difficult to say when he could venture across; for if he waited for the first east and west driver to pass, another might at this moment be within a few feet of the intersection coming from the opposite direction; or if another or several are following close in the wake of the first, must he wait until all of them are across before he may venture over? There are main thoroughfares in this city on which, during the rush hours, automobiles are constantly passing east and west within a few feet of each other. Must a north and south driver wait until the stream of traffic subsides before he attempts to cross?

In *Cincinnati Street Ry. Co.* v. *Snell*, 54 O. S., 197, at 208, in the opinion, Spear, Judge, says:

"In a crowded thoroughfare, to look up and down and wait until all possibility of collision is past, would be like sitting on the bank until the stream should run by, and there would be but few hours in the busy part of the day when it could be practicable to cross."

This language is just as applicable to automobile traffic as to pedestrians and street car traffic.

In a very recent case, *Traction Company* v. *Brandon, Admr.*, 87 O. S., 187, the same justice wrote the opinion. A street car struck a wagon at a street intersection, and the contention of the defendant was, that because the street car could not leave its tracks, the driver of the wagon, even if he reached the crossing slightly in advance of the car, should permit the street car to pass first; that under the circumstances the same degree of vigilance was not to be imposed upon the motorman as that required of the driver of the wagon. The court, at page 103 of the opinion, says:

"A duty to be on the lookout to avoid danger is just as fully imposed on the motorman operating a car as upon the driver of any other vehicle, and the street car company must operate its cars with reference to the rights of others traveling on the street."

In the third part of the syllabus it is held, that in a much frequented part of the city, if a motorman discovers, or by the exercise of ordinary care could have discovered, the driver of a smaller vehicle about to cross the tracks in front of him, at a street crossing, it was his duty to use ordinary vigilance to stop or check the car in order to avoid collision; and even if the driver of a wagon omitted to look for the approach of the car, it will not, as a matter of law, defeat his right to recover if the motorman failed to use such diligence. See *Burvant* v. *Wolfe*, 126 Ia., 787.

Drivers of automobiles, even on country roads, are presumed to know that people are likely to be traveling on the road at all times, and must exercise vigilance accordingly. *Scott* v. *O'Leary*, 138 N. W., 512.

The plaintiff's servant will be presumed and held to know that East 79th street in the city of Cleveland is a much-used thoroughfare and is in constant use by automobiles moving at a rate at least equal to the speed limit. All chauffeurs in the city are presumed to know the traffic conditions on the various streets' on which they drive and operate; and if Sherbondy, plaintiff's servant, as he approached the intersection of Quincy avenue

and East 79th street, was not keeping a sharp lookout and was driving at a rate of speed that prevented him from stopping or checking his car within a reasonable distance so as to avoid collision with the defendant, the plaintiff can not recover, even if the defendant was negligent in attempting to cross Quincy avenue in front of him. See *Wheeler* v. *Wall*, 137 S. W., 63.

In view of these well established principles, we hold that the ordinance, or the paragraphs thereof, of the city of Cleveland, giving drivers of automobiles going in a general east and west direction the right-of-way at street intersections over drivers of automobiles going in a general north and south direction, confers—

1.  Only a preferential, and not an exclusive, right at the street intersections.

2.  Where both parties reach the intersection at approximately the same time, the automobile going in a general east and west direction has a right to cross first.

3.  When the driver of an automobile going in a general north and south direction reaches a street intersection of a main east and west thoroughfare, and sees an automobile approaching on the main east and west thoroughfare, but such distance from the crossing that he may safely pass over, he has a right to do so; and for this purpose he may presume that the driver of such automobile going in a general east and west direction is observing the law as to speed.

4.  The driver of an automobile on such main east and west thoroughfare is required to keep a vigilant lookout as he approaches all street intersections, give due warning of his approach, and have his car under reasonable and proper control.

5.  In cases where it is doubtful whether the preferential right to cross first exists in favor of the driver on the main east and west thoroughfare, the common law doctrine applies, and each must use and exercise due and ordinary care to avoid injury to the other.

6.  By a "main thoroughfare," where it is not indicated, or defined by direction, is meant a thoroughfare having greater length and a larger volume of traffic than intersecting streets

or highways.  The volume of traffic on a street is necessarily affected by its length.

7.  It is negligence *per se,* in a much frequented or built up portion of a city, to drive a vehicle that is so covered in or so constructed or loaded as to prevent the driver thereof from having a sufficient view of the traffic following or at the sides of such vehicle.

The last proposition is substantially Babbitt's 35th rule, which is taken from the New York rules, Section 1, Article XVII.

Automobile owners are by no means the worst offenders against this rule.  The slow-moving covered-in van and the delivery wagon are familiar to all.  In these covered-in vehicles, especially in automobiles, the driver's seat is usually three feet back from the front of the covered side; and unless there are windows on these sides toward the front, it is impossible for the driver to see what is transpiring on either side above thirty feet in front of him; and when some foolhardy driver dashes out of a side street when he is about thirty feet from the intersection, he can not see him, and consequently is not prepared for the emergency that may arise; and if a collision occur, it must be held that his own negligence in driving such a vehicle contributed to it.

Applying these principles to the case at bar, what do we find? Sherbondy, the plaintiff's servant, says that as he approached the intersection he was going or travelling from fifteen to sixteen miles an hour; that the defendant was going from twenty to twenty-five miles an hour; that as he got to the east line of the cross-walk on Quincy avenue he saw the defendant at that time about sixty feet southerly on East 79th street, traveling in the middle of the street, and that he himself was traveling on the side of the street, that is, on the north side; that the front of his car was about eight feet west of the east crossing on Quincy avenue when he saw the defendant, as he says, some sixty feet away.  We have no doubt that the defendant was driving in the middle of the street, and contrary to law; and we are strongly inclined to think that the plaintiff's servant was also driving in the middle of the street.  It is a matter of common observation that drivers of motor vehicles keep as near the center of the

street as circumstances will permit. In so doing they simply follow the impulse of natural law, that is, follow the line of least resistance, for experience has taught them that it is easier to steer or guide a car on the crown than it is on the slope of the street. All paved streets are rounded or crowned at the center and slope toward the curb or gutter. The two streets, that is, Quincy and East 79th, are practically the same width, about thirty-eight feet. If the plaintiff's servant was going fifteen miles an hour, he was traveling at the rate of twenty-two feet a second, and in two seconds he would be completely across East 79th street and some feet westerly of its west crossing, and he would be across before it was possible for the defendant to have reached the line in which he was traveling, even if the defendant was going thirty miles an hour. Indeed the defendant, to have collided with the plaintiff's car, under the circumstances, if Sherbondy's testimony is true, must have been going at the rate of sixty miles an hour. This we believe is not true; indeed it is unthinkable and unbelievable, under the circumstances. On the defendant's car, the top was up and the side curtains were on, and there is no evidence to show there were any windows on these side curtains that would enable Sherbondy to see what was transpiring on the sides immediately in front of him. In so driving a car, so covered in, he was negligent. But, in this connection, his state of mind or mental attitude must be taken into consideration, and a few questions and answers in relation thereto, found on page 18 of the record, will be illuminating:

"Q. In other words, you thought he could pass in behind you? A. It is not up to me to watch Mr. Larkworthy; I had the right-of-way.

"Q. You have the right-of-way; now why? A. Because on main thoroughfares the right-of-way is governed by that. Anything traveling east and west is given the right-of-way over things traveling north and south."

Here we find the real cause of this collision, or at least one of the causes. Sherbondy says it was not up to him to watch the defendant. The law says it was up to him to watch the defendant, to watch everything and everybody, not only in front of him,

but on the sides of him and in the rear of him, so far as he could. Of course he was not required to keep a lookout in the rear to the exclusion of his duty to keep a vigilant lookout in front. He says he made no effort whatever to stop; and furthermore, that he could have stopped if he had desired to, within the length of his car, or seventeen feet. If he could, it was his duty to do so; and having failed to do so, he was negligent. Indeed his entire testimony shows an utter disregard of the rights of others, and the grossest kind of negligence.

Passing now to the testimony of the defendant, we find him saying with the utmost nonchalence that when he came to the intersection he looked eastward on Quincy avenue; that he ap: proached Quincy avenue going about eight miles an hour; that he could see Quincy avenue far to the east; that he slowed down, as he approached the intersection, to four or five miles; that he saw a street car two blocks to the eastward on Quincy; that there was no other vehicle in sight, and that he could not tell which way the street car was moving. Inasmuch as we lose track of this street car in the testimony, it must be presumed that it was going eastward. Two blocks would be at least a thousand to fifteen hundred feet; and when he tells us that he did not see the plaintiff's car as he came to this crossing, in that space of a thousand to fifteen hundred feet eastward, he is stating something that is unbelievable and unthinkable, and the conclusion is irresistible that he did not look. If he had looked, he would have seen the car and would have seen it close to the crossing. He was guilty of the grossest kind of negligence in failing to look. When he did see the plaintiff's car, it must be said for him that he took all the usual and ordinary precautions that were then possible under the circumstances. He swerved sharply to the left, so that after the accident his car was facing due west. In so swerving to the left, the right side of his car collided with the left side of the plaintiff's car, thus causing the injuries complained of. There were three other persons in the defendant's car besides himself, and it is admitted that these persons were not injured in any respect, in fact the testimony shows that they were not disturbed or thrown out of their seats,

and this fact shows two things: first, that the defendant was not going at a rapid rate of speed; secondly, that he did not strike the plaintiff's car, as Sherbondy claims, about the middle thereof. The hubs on these cars were about three inches in diameter toward the inside; and the hub on defendant's right front wheel, which was introduced in evidence as an exhibit, shows clearly that the hub on the left front wheel of the plaintiff's car rode over it, and the plaintiff's car was raised suddenly and with a jerk over three inches, and this, together with the defendant's speed, caused it to be overturned. The fact, however, which escaped both court and counsel in the court below, is this: East 79th street, as well as Quincy avenue, is a main thoroughfare, and of this fact the municipal or city court should have taken judicial notice. Quincy avenue runs from Fairmount Reservoir to East 55th street, its entire length being two miles. East 79th street begins in that part of the extreme southern section of the city known as Union avenue, runs northerly to Linwood, where it enters, without change of direction, into Addison road and continues on to the lake, a distance of seven miles. From Union avenue to Linwood is about five miles. It is twice as long, in any event, as Quincy avenue, and has fully as large a volume of traffic. The ordinance introduced in evidence by the plaintiff provides, "No vehicle shall cross any main thoroughfare or make any turn thereon at a greater speed than one-half the legal speed limit." Sherbondy admits that he came up to and attempted to cross over East 79th street going fifteen or sixteen miles an hour, and going at a rate of speed absolutely prohibited by the ordinance.

The whole testimony conclusively shows—so clearly that the conclusion is irresistible—that both the plaintiff and the defendant were guilty of negligence, and that the collision was the result of their concurring acts of negligence.

The judgment of the municipal court will, therefore, be reversed, and this court, proceeding to render the judgment that should have been rendered by the municipal court, dismisses the petition or statement of claim of the plaintiff and the statement of defense and counter-claim of the defendant, and orders that each party pay one-half the costs.